UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

STEVEN D. STEIN,

     Plaintiff,

v.

TRI-CITY HEALTHCARE DISTRICT, a California healthcare district; LARRY B. ANDERSON, an individual,

     Defendants.

Case No.: 3:12-CV-2524-BTM-BGS

**ORDER DENYING DEFENDANTS TRI-CITY HEALTHCARE DISTRICT'S AND LARRY B. ANDERSON'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

     Defendants Tri-City Healthcare District and Larry B. Anderson have moved for partial summary judgment. For the following reasons, Defendants' motions are DENIED.

## BACKGROUND

     Plaintiff Steven D. Stein ("Stein") is the former Senior Vice President of Legal Affairs and Chief Compliance Officer for Tri-City Healthcare District ("Tri-City"). He has sued his former employer and its Chief Executive Officer, Larry B. Anderson ("Anderson"), for violation of his civil rights; disability discrimination; retaliation; breach of contract; intentional infliction of emotional distress; harassment; false light;

1  and blacklisting. The parties are familiar with the facts giving rise to this litigation and
2  the Court need not detail them further at this time.

3                              **LEGAL STANDARD**

4          A motion for summary judgment will be granted "if the movant shows that
5  there is no genuine dispute as to any material fact and the movant is entitled to
6  judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Anderson v. Liberty
7  Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the burden of proof
8  and "must produce either evidence negating an essential element of the nonmoving
9  party's claim or defense or show that the nonmoving party does not have enough
10  evidence of an essential element to carry its ultimate burden of persuasion at trial."
11  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000)
12  (citation omitted); see also Cleotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("[T]he
13  plain language of Rule 56(c) mandates the entry of summary judgment . . . against a
14  party who fails to make a showing sufficient to establish the existence of an element
15  essential to that party's case, and on which that party will bear the burden of proof at
16  trial."). When ruling on a summary judgment motion, the court must view all
17  inferences drawn from the underlying facts in the light most favorable to the
18  nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.
19  574, 587 (1986) (citation omitted).

20                                **ANALYSIS**

21          Tri-City contends it is entitled to partial summary judgment because Plaintiff
22  cannot establish essential elements of his federal and state retaliation claims. Tri-City
23  also argues that Stein's case impermissibly relies on privileged and confidential
24  information. Anderson argues that he is entitled to partial summary judgment because
25  Plaintiff cannot establish essential elements of his claims for violation of his right to
26  due process, intentional infliction of emotional distress, retaliation, and punitive
27  damages. The Court will address each of these arguments in turn.
28  //

1    **I. Stein's 31 U.S.C. § 3730 Retaliation Claim against Tri-City**

2         Tri-City argues that Stein cannot establish that Tri-City had notice that Stein

3    was engaged in protected activity under the FCA, and thus it could not have retaliated

4    against him for taking such actions.

5         The FCA imposes liability on "any person who . . . knowingly presents, or

6    causes to be presented, a false or fraudulent claim for payment or approval [to the

7    United States government]." 31 U.S.C. § 3729. Additionally, the FCA's anti-

8    retaliation provision states that "[a]ny employee . . . shall be entitled to all relief

9    necessary to make that employee . . . whole, if that employee . . . is discharged . . .

10   because of lawful acts done by the employee . . . in furtherance of an action under this

11   section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. §

12   3730(h)(1).

13        The Ninth Circuit has held that "[a]n FCA retaliation claim requires proof of

14   three elements: 1) the employee must have been engaging in conduct protected under

15   the Act; 2) the employer must have known that the employee was engaging in such

16   conduct; and 3) the employer must have discriminated against the employee because

17   of her protected conduct." United States ex rel. Cafasso v. Gen. Dynamics C4 Sys.,

18   Inc., 637 F.3d 1047, 1060 (9th Cir. 2011) (internal quotation marks and citation

19   omitted).

20        Tri-City's argument is limited to the second element: notice. "The standard for

21   notice . . .  is flexible: the kind of knowledge the defendant must have mirrors the kind

22   of activity in which the plaintiff must be engaged." United States ex rel. Williams v.

23   Martin-Baker Aircraft Co., 389 F.3d 1251, 1260 (D.C. Cir. 2004) (internal quotation

24   marks and citation omitted). In this case, Plaintiff alleges he was undertaking efforts

25   to prevent a violation of the FCA, thus he must show that Tri-City knew about his

26   efforts.

27        However, many of the Circuit Courts of Appeal have held that when an

28   employee's job duties include providing information or advice regarding compliance

3

1   with regulations or laws, the bar for proving the employer knew about the employee's

2   protected activities is higher than it would be for a conventional employee. This is

3   because compliance employees are presumed to be acting in accordance with their job

4   duties. To prove that their employer knew the employee was engaging in protected

5   conduct, plaintiffs must show that they went beyond their normal job duties. See

6   Maturi v. McLaughlin Research Corp., 413 F.3d 166, 172-73 (1st Cir. 2005);

7   Williams, 389 F.3d at 1260-61; Yuhasz v. Brush Wellman, 341 F.3d 559, 567 (6th

8   Cir. 2003); Brandon v. Anesthesia & Pain Mgmt. Assocs., 277 F.3d 936, 945 (7th Cir.

9   2002); Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 191-93 (3d Cir. 2001);

10  Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 868-69 (4th Cir. 1999);

11  United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1522-23

12  (10th Cir. 1996); Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948, 951-52 (5th

13  Cir. 1994).

14      While the Ninth Circuit has not directly addressed this issue, the Court finds the

15  reasoning of the other Courts of Appeal to be persuasive and adopts it. A compliance

16  officer like Stein must prove that he went beyond his normal job duties to show that

17  his employer knew he was engaging in protected activities. Williams, 389 F.3d at

18  1261 ("[W]hen an employee acts outside his normal job responsibilities or alerts a

19  party outside the usual chain of command, such action may suffice to notify the

20  employer that the employee is engaging in protected activity.").

21      Stein's employment agreement outlined his job duties:

22          (i) managing and directing the Medical Center's day-to-day
            legal and compliance program requirements with high level
23          oversight over Medical Center's risk management program,
            provided that the day-to-day operations of the risk
24          management program will be the direct responsibility of
            Medical Center' Risk Manager;
25

26          (ii) oversee the assignment of legal work to outside counsel;
27  //
28  //

4

(iii) to advise the Chief Executive Officer, the Board and responsible Board committees regarding legal and compliance issues; and

(iv) such other duties as may be agreed upon from time to time by Chief Executive Officer and Executive.

("Stein Decl." Exhibit A, Employment Agreement § 4.1).

The agreement further provided that Stein had "direct line reporting to the Chief Executive Officer and dotted line reporting to the Chair of the Board and Audit and/or Compliance Committee of the Board." (Id.). Plaintiff elaborated that he reported to the CEO on a "day-to-day" basis, but "also had an obligation to the audit committee and the board on compliance issues . . . when we had meetings." (Doc. 240-3, Declaration of Robert Mahlowitz ("Mahlowitz Decl.") Exhibit A, Deposition of Steven Stein ("Stein Depo.") 51:6-14).

As an attorney and Tri-City's Chief Compliance Officer, any legal advice Stein gave within the normal course of his duties was not sufficient to put Tri-City on notice that Stein was engaged in protected activity, even if he warned that particular actions violated the False Claims Act or other federal laws. See Robertson, 32 F.3d at 952 (finding no notice where "the record contains no evidence that [the plaintiff] expressed any concerns to his superiors other than those typically raised as part of a contract administrator's job" and "[the plaintiff's] actions were consistent with the performance of his duty."). But see Eberhardt, 167 F.3d 868-69 (employee tasked with internal investigation of fraud put employer on notice by characterizing conduct as illegal and recommending defendant obtain counsel). Stein's job duties included day-to-day reporting to Anderson on compliance issues. Accordingly, his reports to Anderson that particular actions would violate the FCA (Stein Decl. ¶¶ 6-8) did not put Defendants on notice that Stein was engaged in protected activity.

However, Plaintiff has also advanced evidence that he acted outside his normal duties and chain of command. For example, Stein reported his belief that several of

1   the proposed transactions would lead to violations of the False Claims Act to not only

2   Anderson, but also to Chief Operating Officer Casey Fatch, Jeff Segal, and outside

3   counsel Mary Norvell. (Id.). Stein also raised his concerns again during the March 2,

4   2012 executive meeting, which included Anderson, Casey Fatch, Kathy Naylor,

5   Sharon Shultz, Alex Yu, and Allison Borkenheim. (Id. at ¶ 11; Stein Depo. 290:8-15).

6   Moreover, Stein also sought a meeting with Tri-city Board of Directors members

7   Charlene Anderson and George Coulter to discuss potential FCA violations, but his

8   request for a meeting was denied.[1] (Stein Decl. ¶ 9).

9          Based on the foregoing, a reasonable jury could find that Stein's multiple

10  reports outside his usual chain-of-command went beyond his normal day-to-day duties

11  and put Tri-City on notice that Stein was making efforts to prevent a violation of the

12  FCA. Defendant has not carried its burden of showing that Plaintiff cannot prove that

13  Tri-City knew about Stein's protected activity. Summary judgment on this basis is

14  denied.

15  **II. Stein's Cal. Labor Code § 1102.5 Retaliation Claim against Tri-City**

16         Tri-City contends that it is entitled to partial summary judgment on Stein's

17  California retaliation claims because (1) Plaintiff cannot establish that his allegedly

18  protected conduct went beyond his job duties, (2) Plaintiff failed to disclose

19  information to a government or law enforcement agency, and (3) Plaintiff failed to

20  exhaust his administrative remedies.

21         1. Stein's activities and job duties

22         From January 1, 2004, to December 31, 2013, Cal. Labor Code § 1102.5

23  provided that"[a]n employer may not retaliate against an employee for disclosing

24  _____

25  [1] While Stein's job duties did require him to report compliance issues to the Chair of
    the Board and Audit and Compliance Committee of the Board, it appears that his

26  "dotted-line" reporting responsibility only arose at Board meetings. (Stein Decl.
    Exhibit A, Employment Agreement § 4.1; Stein Depo. 51:6-14). In this case, Stein

27  allegedly sought to meet with several Board members on his own initiative, outside
    his normal duties and chain of command.

28

information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute . . . ." However, the plaintiff must also show that their disclosure of information went beyond their normal job duties. See, e.g., Edgerly v. City of Oakland, 211 Cal. App. 4th 1191, 1207 (2012); Lukov v. Schindler Elevator Corp., 2012 WL 5464622. at *6 (N.D. Cal. Nov. 8, 2012).[2]

Defendant contends that there is no evidence that Stein acted outside his job duties when he reported his concerns of potential illegality. However, for the same reasons discussed in the previous section, the Court rejects this argument. There is sufficient evidence on which a reasonable jury could conclude that Stein went outside his normal duties and chain of command when he reported his concerns to the Chief Operating Officer, outside counsel, and others, and sought a special meeting with several members of the Board of Directors to discuss potential FCA violations.

2. Disclosure to a Government or Law Enforcement Agency

During the relevant time, Cal. Labor Code § 1102.5 protected employees from retaliation for disclosures of a violation of law, but only if they made the disclosure to a government or law enforcement agency.[3] California courts interpreted the statute to allow employees of government entities to disclose violations of law to their own employer and qualify for whistleblower protection. Edgerly, 211 Cal. App. 4th at 1199.

//
//

---

[2] The California Labor Code was amended after the facts giving rise to this case. Effective January 1, 2014, § 1102.5(b) now protects disclosures "regardless of whether disclosing the information is part of the employee's job duties."

[3] § 1102.5(b) has since been amended to also protect disclosures "to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry."

1    Tri-City maintains that at least one California appellate court, <u>Mize-Kurzman v.</u>

2  <u>Marin Cmty. Coll. Dist.</u>, 202 Cal. App. 4th 832, 857-58 (2012), has suggested that an

3  employee may obtain whistleblower protection from disclosing a violation of law to

4  their own government employer only if the supervisor or employer they disclose to is

5  not the suspected wrongdoer.

6    The Court is not persuaded that California's whistleblower protection laws are

7  subject to such limitation. First, the <u>Mize-Kurzman</u> court was focused on whether

8  information passed along to a supervisor in the normal course of duties qualified for

9  protection under the statute. The court ultimately held that "where the supervisor is

10  *not* the alleged wrongdoer . . . , it cannot categorically be stated that a report to a

11  supervisor in the normal course of duties is not a protected disclosure." Defendant is

12  attempting to apply the court's analysis from one issue (whether disclosure consistent

13  with one's job duties qualifies for protection) to another issue (whether a public

14  employee's report to their own employer qualifies for protection). Defendant does not

15  justify this cross-application and the Court rejects it.

16    Furthermore, Cal. Labor Code § 1102.5(e) expressly provided that "[a] report

17  made by an employee of a government agency to his or her employer is a disclosure of

18  information to a government or law enforcement agency." The statute imposes no

19  limitation on this language that would support Defendant's theory that the public

20  employer must have clean hands.

21    Moreover, even if the Court agreed that Stein was required to disclose a

22  violation of law to a government entity not the subject of that disclosure, Stein's

23  attempt to report his concerns to the Board of Directors would qualify. While

24  Anderson and the other executives of Tri-City would be implicated in the allegedly

25  unlawful transactions, the transactions had not yet occurred when Stein disclosed them

26  and the Board had not ratified or endorsed the transactions. Accordingly, the Court

27  finds that Plaintiff has advanced sufficient evidence to establish that he disclosed

28

1   violations of law to his own public employer and that such disclosures qualify for

2   protection under Cal. Labor Code § 1102.5(b).

3            3. Exhaustion of Administrative Remedies

4           Tri-City argues that Plaintiff must establish that he exhausted his administrative

5   remedies before pursuing a claim for retaliation under California's whistleblower

6   protection laws. In 2012, Cal. Labor Code § 1102.5 was silent as to whether

7   administrative exhaustion was required. The California Supreme Court suggested in

8   2005 that exhaustion may be required. See Campbell v. Regents of the Univ. of

9   California, 35 Cal.4th 311, 329 (2005). As of January 1, 2014, the labor code was

10   amended to state that "[a]n individual is not required to exhaust administrative

11   remedies or procedures in order to bring a civil action under any provision of this

12   code, unless that section under which the action is brought expressly requires

13   exhaustion of an administrative remedy." Cal. Labor Code § 244(a). See also §

14   98.7(g) ("In the enforcement of this section, there is no requirement that an individual

15   exhaust administrative remedies or procedures.").

16           The Ninth Circuit has found that these amendments clarify pre-existing law and

17   are thus applied retroactively to claims which accrued prior to their effective date.

18   Reynolds v. City & Cnty. of San Francisco, 12-16042, 2014 WL 2211677, at *2 (9th

19   Cir. May 29, 2014) (unpublished). Cal. Labor Code § 1102.5 contains no exhaustion

20   requirement. Accordingly, the Court holds that Cal. Labor Code §§ 98.7(g) and 244(a)

21   apply retroactively to Stein's claim and finds that he was not required to exhaust

22   administrative remedies before filing suit. Tri-City's motion for partial summary

23   judgment on this basis is denied.

24         **III. Stein's Reliance on Privileged and Confidential Information**

25           Tri-City argues that Plaintiff cannot prove either of his retaliation claims

26   because the alleged basis for Plaintiff's termination was his legal advice to Tri-City,

27   and the content of such advice is subject to the attorney-client privilege and California

28   ethical rules governing disclosure of confidential client information.

The Court is persuaded that Plaintiff will be able to prove the essential elements of his retaliation claims without disclosing the content of communications subject to the attorney-client privilege. Moreover, if Plaintiff does seek to admit privileged or confidential information into evidence, the Court has at its disposal a variety of tools to prevent public disclosure of that information, including sealing the courtroom and transcripts and instructing the jury. See Gen. Dynamics Corp. v. Superior Court, 7 Cal.4th 1164, 1170, 1191 (1994). Partial summary judgment on this basis is denied.

**IV. Stein's 42 U.S.C. § 1983 Civil Rights Claim against Anderson**

Anderson argues he is entitled to partial summary judgment because (1) there is no proof that Anderson was involved in the denial of Stein's rights, (2) he is entitled to qualified immunity, and (3) he is a redundant defendant.

1. Anderson's Involvement in the Denial of Stein's Due Process Rights

To establish that Anderson is liable in an individual capacity for a violation of Stein's right to a pre-termination hearing, Plaintiff must show that Anderson either "participated in or directed the violations" of his rights, Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989), or that he "set in motion a series of acts by others, or knowingly refused to terminate [such acts], which he knew or reasonably should have known, would cause others to inflict the constitutional injury," Levine v. City of Alameda, 525 F.3d 903, 907 (9th Cir. 2008).

Anderson argues there is no evidence that he was involved in the denial of Stein's rights. Anderson contends that he ceased his involvement after March 3, 2012 and "there was a handoff, a clear handoff, and other people took over with my permission, my blessing." (Doc. 206-2 Declaration of George Rikos ("Rikos Decl.") Exhibit 5, Deposition of Larry Anderson 68:17-20).

Stein contends that there is a dispute of material fact as to Anderson's involvement in his termination. First, Stein alleges that he never resigned and was effectively terminated by Anderson directly on March 2, 2012, when Anderson sent him a letter purporting to accept his resignation, (Stein Decl. Exhibit D), and arranged

1    for Stein's access to Tri-City's computer network to be cut off, (Mahlowitz Decl.

2    Exhibit B, Deposition of Larry Anderson ("Anderson Depo.") 74:25-75:5).

3         Second, Stein argues that even if his termination did not occur until Tri-City

4    sent him the March 22 termination letter (Stein Decl. Exhibit H), there is

5    circumstantial evidence that Anderson oversaw the issuance of the March 22 letter and

6    Stein's termination: Anderson was the CEO of Tri-City and only executive senior to

7    Stein (Anderson Depo. 23:20-24:6); Anderson knew that Kathleen Naylor, the Vice

8    President of Human Resources who signed the March 22 letter, had no experience

9    terminating employees at public entities or providing due process rights and had only

10   been working at Tri-City for a few weeks (Anderson Depo. 105:2-106:17; Mahlowitz

11   Decl. Exhibit E, Deposition of Kathleen Naylor ("Naylor Depo.")  9:6-11, 78:8-12);

12   Naylor testified that she signed the letter, but did not develop its content, which was

13   provided by to her by Tri-City attorney Allison Borkenheim (Naylor Depo. 48:11-

14   50:6); Naylor's supervisor, Casey Fatch, allegedly told Naylor to work directly with

15   Anderson on the termination letter (Mahlowitz Decl. Exhibit C, Deposition of Casey

16   Fatch ("Fatch Depo.") 21:10-22:4, 45:15-24); and Tri City's current Vice President of

17   Human Resources, Esther Beverly, testified that Anderson approved the internal

18   reporting documentation for Stein's termination (Mahlowitz Decl. Exhibit I,

19   Deposition of Esther Beverly ("Beverly Depo.") 65:9-67:3).  If this evidence is

20   credited, a jury could reasonably conclude that Anderson was directly involved Stein's

21   March 22 termination without notice or hearing.

22        Third, even if Anderson was not directly involved in the March 22 termination,

23   there is evidence he set in motion acts which he knew or should have known would

24   cause Stein to be terminated without notice or hearing. Anderson knew that Naylor

25   had no experienced involving due process rights and that she was a new to her job, but

26   the matter was nonetheless entrusted to her. On these facts, a reasonable jury could

27   find that Anderson failed to provide proper supervision of his subordinates and that he

28   knew or should have known that Stein's rights would be violated. Anderson's

1    apparent indifference stands in contrast to the care exercised by supervisors in other

2    cases where Courts found no liability. See, e.g., Levine, 525 F.3d at 907 ("[Defendant]

3    forwarded [plaintiff's] letter requesting a pretermination hearing to [the director of

4    human resources] and expressly told her to ensure that [plaintiff's] due process rights

5    were respected.").

6          Based on the foregoing, the Court finds that Plaintiff has advanced sufficient

7    evidence to establish that Anderson was either directly involved in, or set in motion

8    acts resulting in, Stein's termination without notice and hearing and thus violated

9    Stein's constitutional right to pre-termination notice and hearing. Anderson's motion

10    for partial summary judgment on this basis is denied.

11          2. Qualified Immunity

12          Anderson contends that, even if he did violate Stein's rights, he is nonetheless

13    protected by qualified immunity because he acted reasonably under the circumstances.

14    "Under the defense of qualified immunity, a government official is immune from civil

15    damages unless his conduct violates a clearly established right of which a reasonable

16    person would have known." Levine, 525 F.3d at 906 (citation omitted). Courts

17    consider two factors to determine if an official is entitled to qualified immunity:

18    "First, . . . whether the official violated a constitutional right. Second, . . . whether the

19    right was clearly established such that a reasonable official would [have] known that

20    he was engaging in unlawful conduct." Id. (citations omitted).

21          Once the defense is invoked, the plaintiff bears the burden of proving that the

22    right in question was clearly established. Brewster v. Bd. of Educ. of Lynwood

23    Unified Sch. Dist., 149 F.3d 971, 977 (9th Cir. 1998) (citation omitted). For a right to

24    be clearly established, "[t]he contours of the right must be sufficiently clear that a

25    reasonable official would understand that what he is doing violates that right." Id.

26    (citation omitted). Thus, the Court must consider not only whether the generalized

27    right to pre-termination notice and hearing existed in the abstract in March 2012, but

28    also whether that right was clearly applicable to Stein's separation from Tri-City. See

1   Id. "In other words, courts adjudicating claims of qualified immunity must look not to

2   constitutional guarantees themselves but to the various doctrinal tests and standards

3   that have been developed to implement and to administer those guarantees." Id.

4   (citation omitted). If the application of a right to a particular set of facts is ambiguous,

5   then even an official who ultimately violated the plaintiff's rights will be entitled to

6   qualified immunity. Id. ("If officers of reasonable competence could disagree on the

7   issue whether a chosen course of action is constitutional, immunity should be

8   recognized." (citation omitted)).

9       i. Whether Anderson Violated Stein's Rights

10          The Supreme Court has explained that "[a]n essential principle of due process is

11   that a deprivation of life, liberty, or property be preceded by notice and opportunity

12   for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v.

13   Loudermill, 470 U.S. 532, 542 (1985).  Accordingly, when an employee "has a

14   constitutionally protected property interest in his employment," there must be "some

15   kind of hearing prior to . . . discharge." Id. The Loudermill Court found that a public

16   employee had a property interest in continuing employment when a state statute

17   provided he could only be dismissed for cause. Id. at 538–39, 546. See also Walker v.

18   City of Berkeley, 951 F.2d 182, 183 (9th Cir. 1991) ("[C]ivil servant who, under City

19   regulations, could be terminated only for cause . . . had a property interest in her

20   employment that entitled her to due process protection."). A property interest in

21   continued employment can also be created by contract. See, e.g., San Bernardino

22   Physicians' Servs. Med. Grp., Inc. v. San Bernardino Cnty., 825 F.2d 1404, 1408 (9th

23   Cir. 1987) ("constitutionally protectible entitlement may arise from contractual

24   language providing for discharge from employment only for cause.");  Vanelli v.

25   Reynolds Sch. Dist. No. 7, 667 F.2d 773, 777 (9th Cir. 1982) ("employee dismissed

26   during the term of a one-year contract and in breach of its provisions has a legitimate

27   claim of entitlement and a property interest in continued employment.").

28          In this case, Stein's employment agreement with Tri-City provided that

13

"[t]he Company shall employ Executive, under this agreement, starting on the Effective Date, and shall continue unless terminated as provided for under the terms of this Agreement." (Stein Decl. Exhibit A, Employment Agreement ¶ 2). Under the agreement, Stein could be terminated for cause (Id. at ¶ 6.10), or without cause (Id. at ¶ 6.12). If Stein was terminated without cause, he was entitled to sixty days' notice of intent to terminate and continued compensation and benefits during that period. (Id. at ¶ 6.12(a)). The Ninth Circuit has characterized such an employment agreement as "hybrid," insofar as they allow for both with-cause and without-cause termination, and the without-cause termination provision entitles the employee to a limited period of continued employment during which he or she can only be terminated for cause. Fed. Deposit Ins. Corp. v. Henderson, 940 F.2d 465, 476 (9th Cir. 1991). Hybrid agreements, such as the agreement between Stein and Tri-City, create a limited but cognizable property interest which is protected by the Constitution and which cannot be taken without due process. Id.

The Court finds that there is sufficient evidence to establish that Stein had a cognizable property interest in continued employment at Tri-City based on his employment agreement's without-cause-termination and sixty-days-notice provisions; that this property interest was protected by the due process clause; that Tri-City terminated Stein either on March 2, 2012, or March 22, 2012, without pre-termination notice and hearing in violation of Stein's rights to due process; and that Anderson either personally directed Stein's termination without due process or that he set in motion acts by others which he knew or should have known would result in Stein's termination without due process. The Court must now determine whether Stein's rights were clearly established when he was terminated.

ii. Whether Stein's Rights were Clearly Established

A public official is only liable for the deprivation of an individual's rights if those rights were clearly established at the time of the deprivation. Levine, 525 F.3d at

906. Plaintiff must show that the contours of the right to pre-termination notice and hearing were clearly applicable to his situation. Brewster, 149 F.3d at 977.

The right to pre-termination notice and hearing for public employees who could only be dismissed for cause was clearly established as early as 1985 in Loudermill, 470 U.S. at 538-39. Moreover, in 1991 the Ninth Circuit applied this right to situations, like Stein's, where the plaintiff has a hybrid employment contract that provides for both at-will and for-cause termination. Fed. Deposit Ins. Corp., 940 F.2d at 476.

Defendant contends that, given the unique factual situation of this case -- wherein a reasonable official could have concluded that Stein had resigned -- it was not clearly established that Stein was entitled to pre-termination notice and hearing. Anderson's argument does have some merit. The Court previously determined that whether Stein resigned or was terminated is a dispute of material fact that will have to be resolved at trial. A public official facing Stein's sudden departure from the March 2, 2012 meeting, his statement that he was leaving, and his removal of some of his possessions from his office, could reasonably conclude that Stein had resigned. (Stein Depo. 299:4-24, 306:5-13, 310:9-15). Under this premise, there would be no need to provide pre-termination notice and hearing because there had been no termination.

However, even if it was reasonable to believe that Stein had resigned at first, Stein contested that notion almost immediately. After leaving the office on March 2, Stein sent an e-mail to Tri-City's Director of Occupational Health and Wellness requesting the forms required to obtain a medical leave. (Stein Depo. 305:8-10; Mahlowitz Decl. Exhibit G, Deposition of Rudy Gastelum ("Gastelum Depo.") 6:20-22, 15:2-16). When he received Anderson's letter purporting to accept his resignation, he promptly e-mailed Anderson, made it clear that he had not resigned, and he gave Anderson the option of approving his leave or terminating him under his employment agreement. (Stein Decl. ¶13; Stein Decl. Exhibit E). By the time the March 22 termination letter was sent, it was abundantly clear that Stein did not believe he

resigned and that he expected to be granted leave or terminated. In this context, a reasonable public official would understand that the well-established right to per-termination notice and hearing applied to Stein. Anderson's involvement in Stein's termination without notice and hearing at this point violated clearly established rights. Accordingly, the Court finds that Anderson is not entitled to qualified immunity and denies summary judgment on this basis.

### 3. Redundant Defendant

Anderson argues that he is a redundant defendant because he is liable, if at all, only in an official capacity and that Tri-City is the real party-in-interest. Generally, "[a]n official capacity suit against a municipal officer is equivalent to a suit against the entity. When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant." Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dept., 533 F.3d 780, 799 (9th Cir. 2008). However, in this case, Plaintiff has bought suit against Anderson in his personal capacity based on his direct involvement in Stein's termination without due process or, alternatively, his failure to supervise his subordinates, resulting in Stein's termination without due process. Anderson is not a redundant defendant and thus cannot be dismissed on this basis.

### V. Stein's Emotional Distress Claim against Anderson

Anderson contends that Stein's claim for intentional infliction of emotional distress ("IIED") must fail as a matter of law because Plaintiff cannot establish the required elements of the offense.

To prevail on an IIED claim under California law, Stein must prove "(1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Terice v. Blue Cross of California, 209 Cal.App.3d 878, 883 (1989) (citation omitted).

### 1. Outrageous Conduct

Conduct is only "outrageous" if it is "so extreme as to exceed all bounds of that usually tolerated in a civilized society." Id. (citation omitted). Generally, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" will not rise to the level of being outrageous conduct for purposes of an IIED claim. Fisher v. San Pedro Peninsula Hospital, 214 Cal.App.3d 590, 617 (1989). Similarly, termination from employment and other routine management activity will not normally support an IIED claim, "even if an improper motivation is alleged." Janken v. GM Hughes Electronics, 46 Cal.App.4th 55, 80 (1996).

However, California courts have recognized that a violation of a fundamental civil right protected by law can be, by its very nature, "outrageous conduct" that "exceeds all bounds of decency usually tolerated by a decent society." Id. at 618 (holding sexual harassment by an employer can constitute outrageous conduct); accord Barsell v. Urban Outfitters, Inc., 2009 WL 1916495, at *6-7 (C.D. Cal. July 01, 2009) (holding disability discrimination can constitute outrageous conduct and noting that "intentional infliction of emotional distress claims . . . can be brought where the distress is engendered by an employer's illegal discriminatory practices." (internal quotation marks and citations omitted)); Kovatch v. California Cas. Mgmt. Co., 65 Cal.App.4th 1256, 1278 (1998) (holding sexual orientation harassment by an employer can constitute outrageous conduct), overruled on other grounds, Aguilar v. Atlantic Richfield Co., 25 Cal.4th 826, 853 n.19 (2001).

Plaintiff reasons that Anderson discriminated against him on the basis of his medical disability contrary to the Americans with Disabilities Act and California's Fair Employment and Housing Act. Stein began to suffer from a gastrointestenial disorder in 2010, later diagnosed as Irritable Bowel Syndrome ("IBS"). Stein informed Anderson of his condition in 2010. (Stein Decl. ¶ 4; Stein Decl. Exhibit B). Stein began to work from home when his IBS was particularly difficult, but Anderson directed him to cease doing so in February 2012. (Stein Decl. ¶ 5b). While meeting

with Anderson shortly thereafter, Stein again explained his condition and asked to be allowed to work a part-time or flexible schedule, but Anderson refused and warned Stein that he could hire a healthy healthcare attorney. (Id.). Stein interpreted this statement to mean that Anderson would terminate him if his IBS condition continued. (Id.) Stein also witnessed what he perceived to be threats of disability discrimination directed at other employees by Anderson during his time at Tri-City. (Id. at ¶¶ 5a, c, d). After leaving the March 2 executive meeting and returning home, Stein asked Tri-City's Director of Occupational Health and Wellness to send him the required paperwork so he could request medical leave. (Stein Decl. ¶ 11; Stein Decl. Exhibit C; Stein Depo. 305:8-10; Gastelum Depo. 6:20-22, 15:2-16). Later that day, Anderson sent Stein a letter that purported to accept Stein's resignation. (Stein Decl. ¶ 12; Stein Decl. Exhibit D). Anderson also arranged for Stein's access to the computer network to be cut off. (Stein Decl. ¶ 12; Anderson Depo. 74:25-75:5).

Based on the foregoing evidence, a jury could reasonably find that Anderson discriminated against Stein by failing to provide reasonable accommodation and terminating him on the basis of his IBS medical condition contrary to the Americans with Disabilities Act and California's Fair Employment and Housing Act, and that this conduct was accordingly outrageous and beyond the bounds of a civilized society.

2. Intention of Causing or Reckless Disregard of Causing Emotional Distress

Defendant maintains that there is no evidence that he intended to cause Plaintiff to suffer emotional distress. A plaintiff seeking to prevail on an IIED claim must also establish that the defendant intended to cause the plaintiff to suffer emotional distress, or that he or she recklessly disregarded the risk of causing such distress. Terice, 209 Cal.App.3d at 883.

Based on the previously discussed evidence of discrimination, the Court finds that there is a dispute of material act as to whether Anderson intended to cause Plaintiff emotional distress. A reasonable jury could infer from those facts that

1   Anderson intended his discrimination to cause Stein emotional harm, or recklessly

2   disregarded the risk that his discrimination would have such harm.

3          3. Severe or Extreme Emotional Distress

4          To succeed on a claim for emotional distress under California law, Stein must

5   be able to show that he suffered "severe or extreme emotional distress." Terice, 209

6   Cal.App.3d at 883. This requires Plaintiff to show "more than the stress of everyday

7   life." Su v. M/V S. Aster, 978 F.2d 462, 474 (9th Cir. 1992) (citing Spurrell v.

8   Bloch, 40 Wash.App. 854, 863 (1985) ("one sleepless night, tears, loss of appetite,

9   and anxiety" did not "demonstrate mental or emotional distress."); Lawson v. Boeing

10  Co., 58 Wash.App. 261, (1990) ("depression, loss of appetite, libido and energy,

11  sleeplessness, and increased headaches . . . are not signs of distress above that level

12  which is a fact of life and do not constitute severe emotional distress")).

13         Stein has advanced evidence that, in the wake of his termination, he suffered

14  anxiety and panic attacks, which included shaking, trembling, racing heart, and racing

15  thoughts. (Stein Depo. 368:21-369:3, 370:9-13). Stein testified that he rarely or never

16  left his house from March 2 to 19, 2012. (Id. at 372:4-8). He sought medical treatment

17  for his distress. (Id. at 369:4-19). Based on these facts, a jury could find that Stein's

18  distress went beyond the stress of everyday life and was sufficiently severe or extreme

19  to enable an IIED claim. The Court concludes there is a dispute of material fact as to

20  this issue, which precludes summary judgment.

21         4. Actual and Proximate Causation

22         Finally, Defendant contends that Plaintiff has presented no evidence that

23  Anderson's conduct caused Stein's emotional distress. To prevail on an IIED claim,

24  the fourth and final element the plaintiff must establish is that there is "actual and

25  proximate causation of the emotional distress by the defendant's outrageous conduct."

26  Terice, 209 Cal.App.3d at 883. Based on the nature of Anderson's alleged

27  discrimination against Stein and also the close temporal nexus between Stein's

28  termination and his emotional distress, the Court finds that there is sufficient evidence

1   in the record on which a jury could find that Anderson's conduct was both the actual

2   and proximate cause of Stein's emotional distress.

3       In summary, the Court finds that Plaintiff has advanced sufficient evidence to

4   establish each of the four elements for an IIED claim against Anderson. Summary

5   judgment on this basis is denied.

6   **VI. Stein's 31 U.S.C. § 3730 Retaliation Claim against Anderson**

7       Defendant argues that Stein cannot demonstrate any actionable conduct by

8   Anderson in support of Stein's claim for retaliatory discrimination under the False

9   Claims Act. An FCA retaliation claim requires proof that (1) the plaintiff engaged in

10  protected activity, (2) the defendant knew about plaintiff's protected activity, and (3)

11  the defendant discriminated against plaintiff because of his or her protected activity.

12  Cafasso, 637 F.3d at 1060.

13      1. Stein's Protected Activity

14      Defendant argues that Stein fails to allege that he engaged in protected activity.

15  The FCA protects employees from retaliation for "lawful acts done by the employee

16  . . . in furtherance of an action under this section or other efforts to stop 1 or more

17  violations of this subchapter." Generally, "[v]iolations of laws, rules, or regulations

18  alone do not create a cause of action under the FCA. It is the false *certification* of

19  compliance which creates liability when certification is a prerequisite to obtaining a

20  government benefit." United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th

21  Cir. 1996).

22      Plaintiff has advanced evidence that he believed several transactions Tri-City

23  was considering would constitute violations of various federal laws, would ultimately

24  result in Tri-City violating the False Claims Act, and that he warned multiple people

25  inside and outside Tri-City of his concerns. (Stein Decl. ¶¶ 6-8). Plaintiff further

26  explained at oral argument that Stein believed Tri-City would need to certify that it

27  was in compliance with the federal laws he believed were about to be violated to

28  obtain federal funds, and that such false certification would violate the False Claims

1  Act. The Court finds that there is sufficient evidence in the record to conclude that

2  Stein was engaged in "efforts to stop 1 or more violations" of the FCA, which is

3  protected activity under the FCA's anti-retaliation provision.

4          2. Anderson's Knowledge that Stein was Engaged in Protected Activity

5          Anderson maintains that he had no knowledge that Stein was engaged in

6  protected activity because any warnings and legal advice he provided were part of his

7  job duties as Vice President of Legal Affairs and Chief Compliance Officer. This

8  argument is similar to Tri-City's and the Court rejects it on the same grounds. There is

9  sufficient evidence in the record to conclude that Anderson knew about Stein's efforts

10  to prevent violations of the FCA based on his communications outside his usual chain

11  of command. Anderson knew that Stein had reported some of his concerns to Jeff

12  Segal, who complained to Anderson about Stein's interference. (Stein Decl. ¶8).

13  Anderson also knew that Stein raised his concerns regarding one of the transactions at

14  the executive meeting on March 2, 2012. (Id. at ¶ 11; Stein Depo. 290:8-15). A jury

15  could also infer that, as CEO, Anderson would have learned of Stein's

16  communications with Casey Fatch, Mary Norvell, and his attempt to meet with

17  several members of the Board of Directors. (Stein Decl. ¶¶ 6-8). This conduct put

18  Anderson on notice that Stein was acting outside his normal job duties to prevent

19  violations of the FCA.

20          3. Causal Relationship between Stein's Acts and Termination

21          Defendant argues that, absent evidence that he knew Stein was engaged in

22  protected activity, it would be impossible for him to retaliate against Stein. Moreover,

23  Defendant maintains that Stein has advanced no evidence of a causal relationship

24  between Plaintiff's activities and his termination. Finally, Anderson argues that Stein

25  was not terminated at all, but rather resigned, and thus plaintiff cannot prove that he

26  was terminated in retaliation for his activities.

27          To prevail on his retaliation claim, Stein must show that Anderson

28  "discriminated against plaintiff because of his or her protected activity." Cafasso, 637

F.3d at 1060. As discussed above, there is sufficient evidence in the record to establish that Anderson knew about Stein's efforts to prevent one or more violations of the False Claims Act. Additionally, the temporal proximity between Stein's efforts to prevent violations of the FCA in February and March 2012 and his termination in March 2012 are sufficient to give rise to an inference of causation. Finally, the Court has previously found that there is a dispute of material fact as to whether Stein resigned or was terminated. If a jury finds that he was terminated, it could ultimately conclude that he was terminated in retaliation for his protected activities.

In summary, the Court finds that Plaintiff has advanced sufficient evidence to establish each of the requisite elements for an FCA retaliation claim against Anderson. Anderson's motion for partial summary judgment on this basis is denied.

## VII. Stein's Punitive Damages Claim against Anderson

Plaintiff is seeking punitive damages against Anderson for his federal civil rights, IIED, falselight, and blacklisting claims. Plaintiff also sought punitive damages against Anderson for his FCA retaliation claim in his First Amended Complaint, but he now concedes that he cannot and withdraws that claim. Defendant argues that Plaintiff cannot establish his entitlement to punitive damages.

### 1. Punitive Damages for Plaintiff's Federal Civil Rights Claim

"[I]t is well-established that a jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." Dang v. Cross, 422 F.3d 800, 807 (internal quotation marks and citation omitted). Plaintiff's § 1983 claim is premised on Anderson's alleged denial of Stein's right to pre-termination notice and hearing. The Court has found sufficient evidence to allow Plaintiff's § 1983 claim to go forward, including evidence that Anderson intentionally terminated Plaintiff without notice or hearing on March 2, 2012, by purporting to accept his resignation and cutting of his access to Tri-City's computer network. Based on the previously discussed evidence of Stein and Anderson's conflicts and

deteriorating relationship culminating in Anderson's outburst at the March 2 meeting (Stein Depo. 296:1-297:1), a jury could reasonably infer that Anderson's motive in violating Stein's rights was to punish him for his disability and/or his efforts to prevent violations of the FCA. This would provide a sufficient basis for a finding of evil motive or intent.

Alternatively, there is also evidence that Anderson was indifferent to Plaintiff's right to due process, as demonstrated by Anderson turning Stein's termination over to others, and in particular Kathleen Naylor, who was a new employee with no experience terminating public employees and protecting due process rights. Based on these facts, a reasonable jury could find that Anderson knew or should have known that a violation of Stein's rights was probable, and that Anderson thus possessed the requisite "reckless or callous indifference" to Stein's constitutional right to due process. Accordingly, Plaintiff is entitled to seek punitive damages for his § 1983 claim at trial.

### 2. Punitive Damages for Plaintiff's IIED Claim

Plaintiff's entitlement to punitive damages for his California IIED claim is governed by state law. See Central Office Tel. v. AT&T Co., 108 F.3d 981, 993 (9th Cir. 1997), rev'd on other grounds, 524 U.S. 214, 228 (1998). To obtain punitive damages under California law, the plaintiff must establish "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a); see also Basich v. Allstate Ins. Co., 87 Cal.App.4th 1112, 1121 (2001) ("[O]n a motion for summary adjudication with respect to a punitive damages claim, the higher evidentiary standard applies. If the plaintiff is going to prevail on a punitive damages claim, he or she can only do so by establishing malice, oppression or fraud by clear and convincing evidence.").

Plaintiff argues that Defendant's conduct was malicious. Malice is defined by § 3294(c) as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and

1  conscious disregard of the rights or safety of others."

2      The basis of Plaintiff's IIED claim is Anderson's allegedly intentional

3  termination of Plaintiff on the basis of his medical condition. The Court has

4  previously found that there is sufficient evidence for Plaintiff's IIED claim to advance

5  based on Anderson's disparaging comments to Stein and others, his refusal to

6  accommodate Stein, his termination of Stein shortly after Stein requested the

7  documents he would need to seek medical leave, and Stein's subsequent emotional

8  distress. Based on these same facts, a jury could reasonably find by clear and

9  convincing evidence that Anderson acted with malice in so much as he intended "to

10  cause injury to the plaintiff." Alternatively, if the jury found that Anderson was liable

11  for IIED based on his "reckless disregard of the probability of causing emotional

12  distress," Terice, 209 Cal.App.3d at 883, then it could also find by clear and

13  convincing evidence that Anderson engaged in "a willful and conscious disregard of

14  the rights or safety of others." The Court concludes that Stein is entitled to seek

15  punitive damages for his IIED claim at trial.

16      3. Punitive Damages for Plaintiff's Falselight and Blacklisting Claims.

17      Plaintiff's entitlement to punitive damages on his falselight and blacklisting

18  claims is also a question of California law governed by Cal. Civ. Code § 3294(a).

19  However, the Court has stayed discovery on these claims until the Ninth Circuit

20  resolves Defendants' appeal of the Court's denial of their Anti-SLAPP motion. (Doc.

21  166). Accordingly, the Court finds that summary judgment is inappropriate at this

22  time and denies Defendant's motion for partial summary judgment on this issue

23  without prejudice. See Fed. R. Civ. P. 56(d)(1).

24  //

25  //

26  //

27  //

28  //

1

## **CONCLUSION**

2         For the foregoing reasons, Defendants' motions for summary judgment (Docs.

3    181, 184) are DENIED.

4

5    **IT IS SO ORDERED**.

6

7    Dated: August 27, 2014

8                                          BARRY TED MOSKOWITZ, Chief Judge
                                           United States District Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28